# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JOSE A. VEGA,

            Petitioner,

      v.                                                      Case No. 10-C-988

GREGORY GRAMS,

            Respondent.

## ORDER DENYING THE PETITION FOR A WRIT OF HABEAS CORPUS

### I. PROCEDURAL HISTORY AND FACTS

On November 5, 2010, Jose A. Vega ("Vega"), a person incarcerated pursuant to a state court judgment, proceeding pro se, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The court screened his petition in accordance with Rule 4 of the Rules Governing Section 2254 Cases and ordered the respondent to answer the petition. (Docket No. 7.) The respondent has submitted his answer, (Docket Nos. 10, 11, 12), and Vega has not replied. All parties have consented to the full jurisdiction of a magistrate judge. (Docket Nos. 6, 9.) The pleadings on this matter are closed and the matter is ready for resolution.

### II. FACTS

>On August 14, 2007, a jury found Vega guilty of intentionally causing the death of William D. Schipper. Police found Schipper lying in a pool of blood on his basement floor at approximately 6:00 p.m. on December 21, 1994. Expert testimony at trial indicated that Schipper died as a result of blunt force trauma to the head. The parties stipulated that the time of death was approximately 5:05 p.m. on December 21, 1994.
>
>A bottle of Kessler's whiskey was found in the basement at the time Schipper's body was discovered. It was found in an ash bin with Schipper's glasses about three feet

> from Schipper's body. Testimony indicated that Schipper often carried a bottle of Kessler's whiskey in his back pocket.
>
> Vega's defense at trial was that the murder was committed by Casimer Leschke, an acquaintance of Vega's who did chores for Schipper and socialized with him. Evidence indicated that Vega and Leschke were together on December 21, 1994, both before and after the murder. However, Vega's defense was that he did not accompany Leschke to Schipper's home on December 21, 1994, and that Leschke committed the murder.

(Docket No. 10-4, ¶2-4.) October 24, 2007, Vega was sentenced to life in prison with a parole eligibility date of 2037. (Docket Nos. 1 at 1; 10-1.)

Vega appealed and the court of appeals affirmed on August 26, 2009 in an unpublished per curiam decision. (Docket Nos. 1 at 2; 10-4.) The Wisconsin Supreme Court denied review on December 14, 2009. (Docket Nos. 1 at 2; 10-7.)

In his present petition, Vega contends that his trial counsel was ineffective for failing to call a fingerprint expert to testify that a fingerprint on a whiskey bottle was insufficient for identification purposes. (Docket No. 1 at 6.) The following relevant facts are contained the court of appeals' decision:

> At trial, Steven Harrington, a fingerprint analyst from the state crime laboratory, testified that he located one latent print on the whiskey bottle recovered from Schipper's basement. He testified that the lab photographed the print. He testified that he compared the print to Vega's fingerprints, and opined that the fingerprint on the bottle matched the print of the left index finger of Vega.
>
> On appeal, Vega argues that [defense attorney Joseph] Norby should have called [fingerprint analyst James] Ferrier as a witness at trial to rebut Harrington's testimony. The record indicates that Norby had retained Ferrier to examine the fingerprint evidence prior to trial, and presented him as a witness at a pretrial suppression hearing. Ferrier testified that he was retired from the city of Milwaukee police department and that he owned a business that did fingerprint analysis. Ferrier examined the whiskey bottle from which the fingerprint was lifted, and two photographs of the fingerprint. He opined that the fingerprint was not suitable for analysis in either form because it did not have sufficient points of identification. He indicated that twelve points of identification, such as ridge endings and bifurcations, are necessary to identify a latent fingerprint by comparing it to a known sample. He testified that the twelve-point test has been standard for a long as he could remember. He testified that the points of identification on the fingerprint on the bottle and in the photographs of the fingerprint were both insufficient to permit

2

identification. He testified that he therefore could not identify the print as coming from Vega, nor eliminate Vega as the source of the print.

In response to Ferrier's testimony at the suppression hearing, the State presented Harrington's testimony. Harrington testified that a fingerprint is suitable for identification when it contains sufficient discernable ridge detail that allows for an accurate comparison and identification. He indicated that there was no standard in the profession or at the state crime lab requiring a particular number of points of comparison in order to make a valid fingerprint identification. He testified that the number of points of identification and the sufficiency of the ridge detail are both factors in the identification of a fingerprint. He testified that in addition to the number of comparable characteristics, factors include the rarity and clarity of the characteristics of the print. He testified that points of identification refer to ridge endings or dividing ridges, dots, or islands. However, he further testified that an actual ridge is neither straight nor continuous, and has pore structure, curvature, and irregularity at the edges. He testified that these individual characteristics cannot be calculated in terms of numbers, and that fingerprint analysis is based more on the quality of the identifying features than on the quantity of points to compare. Harrington also testified that his identification of Vega's fingerprint had been independently confirmed by Patrick Lutz, another state crime lab examiner, through a peer review process.

The record indicates that after the suppression hearing, Lori Higginbothum, an analyst from the FBI, evaluated the fingerprint evidence on behalf of the State. Like Harrington, Higginbothum concluded that the fingerprint evidence derived from the whiskey bottle was suitable for identification and matched Vega's fingerprint. The record indicates that the State was prepared to present Higginbothum as a witness at trial if Ferrier testified, but canceled her appearance when the defense elected not to present Ferrier.

At the postconviction hearing, Norby detailed his reasons for choosing not to call Ferrier as a witness at trial. Essentially, he concluded that Ferrier was not a good witness, and that Ferrier's testimony would not significantly enhance Vega's defense, and might harm it.

Norby testified that, after observing Ferrier at the suppression hearing, he concluded that Ferrier's appearance and testimony did not demonstrate the level of professionalism that he would have expected. He concluded that Ferrier lacked a professional appearance and that his testimony was not clear. He testified that Ferrier seemed to be relying on outdated methods of analysis and did not seem up-to-date in his understanding of the methods used by the other fingerprint experts. Norby concluded that Ferrier's credibility would not come close to matching that of the State's expert witnesses.

Because Ferrier could not eliminate Vega as a source of the fingerprint on the bottle, Norby also concluded that his testimony would not add significantly to the defense. Information in the record indicated that Vega had admitted to police that he had been to Schipper's home on an earlier occasion to deliver wood. In addition, Norby

3

> testified that Vega told him that he might have handled a whiskey bottle belonging to Schipper in the past. In light of the identification made by the State's experts, Ferrier's inability to exclude Vega as a source of the print, and because the defense was not premised on a claim that Vega had never been at Schipper's home and could never have touched the whiskey bottle, Norby concluded that nothing significant would be gained from Ferrier's testimony. He concluded that, if anything, Ferrier's testimony might harm Vega by making the defense look less credible.

(Docket No. 10-4, ¶12-18.) The court of appeals affirmed the circuit court's decision that not calling the fingerprint expert was a reasonable trial strategy. (Docket No. 10-4, ¶11.)

### III. STANDARDS OF REVIEW

> Under the Antiterrorism and Effective Death Penalty Act (AEDPA), [a federal court] may grant a petition for habeas relief from a state court judgment only in one of two limited circumstances: if the state court decision (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Smith v. Grams, 565 F.3d 1037, 1043 (7th Cir. 2009).

The court shall presume that the state court's factual determinations are correct, and the petitioner may rebut this presumption only by clear and convincing evidence. Id. (citing § 2254(e)(1)). The petitioner "bears the burden of showing that the state court's finding of fact or its application of federal law was not only erroneous, but unreasonable." Id. (citing Waddington v. Sarausad, 129 S. Ct. 823, 831 (2009); Sturgeon v. Chandler, 552 F.3d 604, 609 (7th Cir. 2009)). Under the "unreasonable application" prong of (d)(1), it is not enough for the federal court to simply disagree with the conclusion of the state court; the state court's application of Supreme Court precedent must be so erroneous as to be objectively unreasonable. Middleton v. McNeil, 541 U.S. 433, 436 (2004); Yarborough v. Gentry, 540 U.S. 1, 5 (2003).

### IV. ANALYSIS

A petitioner seeking relief pursuant to 28 U.S.C. § 2254 due to an alleged denial of the effective assistance of counsel must demonstrate that the state court's decision on this issue was

contrary to or involved an unreasonable application of Strickland v. Washington, 466 U.S. 668 (1984). Wright v. Van Patten, 128 S. Ct. 743 (2008) (per curiam). Under Strickland, a petitioner is entitled to relief only if he can prove the following two elements. Goodman v. Bertrand, 467 F.3d 1022, 1027 (7th Cir. 2006). First, the petitioner must prove that his counsel's performance was unreasonable. In assessing the reasonableness of counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Raygoza v. Hulick, 474 F.3d 958, 962 (7th Cir. 2007) (quoting Strickland, 466 U.S. at 689). A court assessing the reasonableness of an attorney's performance must be cautious not to view counsel with the distorted perspective offered by hindsight; rather, every effort must be made to evaluate an attorney's performance from the perspective of counsel at the time. Strickland, 466 U.S. at 689. An attorney's actions do not become unreasonable simply because they proved unsuccessful. Id.

Second, the petitioner must prove that this unreasonable conduct prejudiced his defense. It is not enough for petitioner to show that the attorney's error had "some conceivable effect on the outcome." Raygoza, 474 F.3d at 962-63 (quoting Strickland, 466 U.S. at 693). But on the opposite side, it is not necessary for the petitioner to demonstrate that the error more likely than not altered the outcome of the case. Id. Rather, the petitioner must demonstrate "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (quoting Strickland, 466 U.S. at 694).

Ferrier's testimony would not have exonerated Vega. It would not have even contradicted that of the state's experts. Rather, at most, Ferrier would have testified that the latent print was insufficient to confirm or rule out Vega as the source of that print. There is no indication that Ferrier would have testified that there was any reason to believe that the latent print did not come from

5

Vega. Rather, Ferrier's conclusion was based upon his view that the only way to make an identification was by discerning 12 points of identification on the latent print and matching those to the suspect's print. According to Ferrier, because the latent print did not have sufficient points of identification, it was not appropriate for identification. Thus, Ferrier would have simply offered a disagreement about the appropriate methodology that should be utilized in fingerprint identification while doing little to undermine the ultimate conclusions of the state's experts.

As seen at the suppression hearing, had Ferrier been called at trial, in response, the state would have called an analyst for the FBI who would have agreed with the expert from the State Crime Lab that the print was sufficient for identification. Therefore, Ferrier, an experienced fingerprint examiner but still to the eyes of the jury merely a retired local cop, would have been pitted against analysts from the State Crime Lab and the FBI. The defendant would have asked the jury to believe that the retired local cop's view that discerning 12 points of the identification is the only way to properly identify a latent print, as opposed to the more comprehensive holistic approach relied upon by the State Crime Lab and the FBI. This would have almost surely been a losing proposition, particularly in light of Attorney Norby's assessment that Ferrier did not present himself with the clarity and professionalism he believed the jury would have expected.

Instead of throwing a "Hail Mary" pass, Norby took the very reasonable approach of concentrating on the weaknesses of fingerprint identification through cross-examination of the state's expert. (Docket No. 11-15 at 58-61.) Under this strategy, defense counsel effectively blunted the significance the state sought to attach to the fingerprint evidence by pointing out through cross-examination that a person's fingerprint on a highly portable object such as a whiskey bottle is of little probative value to the question of whether the individual was at the place where the object was found, or that the bottle was deposited or touched at any particular time. (Docket No. 11-15 at 67-69.) Calling Ferrier as a fingerprint expert would have been counterproductive since he could not

exclude the defendant as the source of the print. Ferrier could offer nothing more than a general criticism of the state's experts' methodology. Further, if the jury discounted Ferrier's testimony, which was Norby's concern, any benefit gained from his cross-examination would have been neutralized. Thus, blunting the impact of the evidence through an effective cross-examination of the state's expert was certainly a reasonable trial strategy.

Therefore, the court finds no basis to conclude that Vega was denied the effective assistance of counsel when his attorney chose not to call Ferrier. Having reached the same conclusion as the court of appeals, the court is clearly unable to conclude that the decision of the court of appeals was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States, and therefore Vega's petition must be denied.

Finally, in accordance with Rule 11 of the Rules Governing Section 2254 Cases, the court concludes that the petitioner has failed to make a substantial showing of the denial of a constitutional right, see 28 U.S.C. § 2253(c)(2), and therefore denies the petitioner a certificate of appealability.

**IT IS THEREFORE ORDERED** that the petition for a writ of habeas corpus is **denied**. The Clerk shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that a certificate of appealability is **denied**.

Dated at Milwaukee, Wisconsin this 4th day of May, 2011.

s/AARON E. GOODSTEIN
U.S. Magistrate Judge
